# UNITED STATES DISTRICT COURT FOR THE

# NORTHERN DISTRICT OF GEORGIA

# ATLANTA DIVISION

GEORGIA AQUARIUM, INC.,

    Plaintiff,

          v.

PENNY PRITZKER, et al.,

    Defendants.

CASE NO. 1:13-cv-03241-AT

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

PAGE

Statement of Facts ..................................................................................2

Legal Background ..................................................................................5

   I.   The Marine Mammal Protection Act and Implementing Regulations ...........5

   II.  Standard of Review ..........................................................................8

Argument ..............................................................................................9

   I.   The Aquarium Failed to Show That the Imports, in Combination with Other Activities, Are Not Likely to Have a Significant Adverse Impact ...............11

      A.   NMFS Reasonably Found Evidence of an Adverse Impact on the Stock from Live-Capture Removals and Other Human Activities .....11

      B.   The Aquarium's Challenges to NMFS' Analysis of Likely Adverse Impact Are Contradicted by the Record ................................................14

      C.   NMFS Reasonably Declined to Rely on the Aquarium's PBR ..........17

         1.   NMFS Articulated Three Grounds for Not Relying on the Aquarium's Proposed PBR Comparison ..................................18

            a.   The Evidence of A Decline In the Stock Shows That PBR Likely Is Being Exceeded .......................................18

            b.   The Live Captures for Public Display Plus Other Human-Caused Mortality Likely Exceed PBR ...........................19

            c.   The Aquarium's PBR Comparison Is Not Appropriate in this Data-Poor Situation ..................................................22

2.      The MMPA, Regulations and Agency Practice Do Not Mandate Reliance on PBR in This Case ..................................................27

D.      The Aquarium Cannot Rewrite Its Permit Application on Appeal.....34

II.  The Aquarium Failed to Show That Replacement Takes Would Not Occur From the Sakhalin-Amur Stock of Beluga Whales .......................................36

A.      NMFS' Interpretation of 50 C.F.R. § 216.34(a)(7) Is Not Plainly Erroneous or Inconsistent With the Regulation .................................37

B.      The Aquarium Failed To Provide Assurance That Replacement Takes Would Not Occur ................................................................................42

III.  The Aquarium Failed to Show That Five Belugas Were Independent of Their Mothers at the Time of Capture....................................................................45

IV.  The Aquarium's Requested Remedy Is Not Available .................................48

Conclusion ...........................................................................................................50

# TABLES OF AUTHORITIES

<u>CASES</u>                                                                                    <u>PAGE</u>

<u>Am. Forest Res. Council v. Ashe,</u>
    946 F. Supp. 2d 1 (D.D.C. 2013) .......................................................................47

<u>Am. Wildlands v. Kempthorne,</u>
    478 F. Supp. 2d 92 (D.D.C. 2007).....................................................................25

<u>Animal Legal Def. Fund v. Glickman,</u>
    204 F.3d 229 (D.C. Cir. 2000)..................................................................... 22, 33

<u>Animal Welfare Inst. v. Kreps,</u>
    561 F.2d 1002 (D.C. Cir. 1977)..........................................................................41

<u>Auer v. Robbins,</u>
    519 U.S. 452 (1997) ..................................................................................... 37, 45

<u>Baltimore Gas & Elec. Co. v. Natural Res. Def. Council,</u>
    462 U.S. 87 (1983) ................................................................................... passim

<u>Buckhead Civic Ass'n v. Skinner,</u>
    903 F.2d 1533 ......................................................................................................9

<u>Calle v. U.S. Att'y Gen.,</u>
    504 F.3d 1324 (11th Cir. 2007)..........................................................................48

<u>Comm. for Humane Legislation v. Richardson,</u>
    414 F. Supp. 297 (D.D.C. 1976)......................................................................6, 8

<u>Defenders of Wildlife v. U.S. Dep't of Navy,</u>
    733 F.3d 1106 (11th Cir. 2013)..........................................................................26

<u>ExxonMobil Oil Corp. v. FERC,</u>
    487 F.3d 945 (D.C. Cir. 2007)............................................................................35

Fla. Power & Light Co. v. Lorion,
  470 U.S. 729 (1985) ................................................................. 48, 50

Fund for Animals v. Rice,
  85 F.3d 535 (11th Cir. 1996) ............................................... 9, 26, 50

Hall v. McLaughlin,
  864 F.2d 868 (D.C. Cir. 1989)...............................................32

Maine v. Norton,
  257 F. Supp. 2d 357 (D. Me. 2003)......................................22

Marsh v. Or. Natural Res. Def. Council,
  490 U.S. 360 (1989) ..............................................................25

McDonnell Douglas Corp. v. NASA,
  895 F. Supp. 316 (D.D.C. 1995)...........................................49

McElmurray v. U.S. Dep't Agric.,
  535 F. Supp. 2d 1318 (S.D. Ga. 2008) ..................................49

Miccosukee Tribe of Indians v. United States,
  566 F.3d 1257 (11th Cir. 2009) .............................. 17, 26, 33

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,
  463 U.S. 29 (1983) ................................................................9

Sierra Club v. EPA.,
  346 F.3d 955 (9th Cir. 2003) ...............................................49

Sierra Club v. Johnson,
  436 F.3d 1269 (11th Cir. 2006) .............................. 37, 44

Sierra Club v. Leavitt,
  368 F.3d 1300 (11th Cir. 2004) .............................. 48, 50

United States v. L.A. Tucker Truck Lines,
  344 U.S. 33 (1952) .................................................................35

Viraj, LLC v. Holder,

 2013 WL 1943431 (N.D. Ga. May 8, 2013) ........................................................9


STATUTES

5 U.S.C. § 706 ................................................................................................................8

5 U.S.C. § 706(2)(A) ......................................................................................................9

16 U.S.C. § 1361(1) ........................................................................................................6

16 U.S.C. § 1361(6) ........................................................................................................3

16 U.S.C. § 1362(9) ........................................................................................................6

16 U.S.C. § 1362(13) ......................................................................................................6

16 U.S.C. § 1362(20) ....................................................................................................18

16 U.S.C. § 1362(27) ....................................................................................................24

16 U.S.C. § 1371 ................................................................................................ 6, 41, 42

16 U.S.C. § 1371(b) ......................................................................................................28

16 U.S.C. § 1372(b) ............................................................................................ 7, 30, 46

16 U.S.C. § 1374 ............................................................................................................6

16 U.S.C. §§ 1374(b)(2) .................................................................................................7

16 U.S.C. § 1374(d)(3)........................................................................................... passim

16 U.S.C. § 1386(a)(6).................................................................................................28

16 U.S.C. §§ 1387(f)(2)-(3) .........................................................................................28

FEDERAL REGULATIONS

50 C.F.R. § 216.12 ................................................................................. 7, 45

50 C.F.R. § 216.34 .............................................................................. 7, 8, 28

50 C.F.R. § 216.34(a)(4) ........................................................................ passim

50 C.F.R. § 216.34(a)(7) ........................................................................ passim

58 Fed. Reg. 53,320 (Oct. 14, 1993) .......................................................... 38

61 Fed. Reg. 21,926 (May 10, 1996) .......................................................... 39

79 Fed. Reg. 44,733 (Aug. 1, 2014) ............................................................. 7

80 Fed. Reg. 8166 (Feb. 13, 2015) ............................................................. 32

Under the Marine Mammal Protection Act ("MMPA"), an applicant for a permit to import marine mammals bears the burden of showing that certain criteria are met and that the permit is consistent with the MMPA's main purpose of protecting marine mammals in the wild. Georgia Aquarium ("Aquarium") applied to import 18 beluga whales from Russia. The National Marine Fisheries Service ("NMFS"), the expert agency that administers the MMPA, found that the Aquarium had not met its burden. First, very limited data were available about the population trend and full extent of human impacts on the Russian stock of beluga whales from which the 18 whales were removed. What limited data was available indicated that continuing live-capture removals and other human-caused mortality likely are having an adverse impact on the stock. NMFS thus was unable to find that the imports, in combination with other human activities, were not likely to have a significant adverse impact on the stock, a showing required by the MMPA and implementing regulations. Second, there was no assurance that the ongoing Russian capture operation would not take more belugas from this stock to replace those proposed for importation, a showing also required by the MMPA and the regulations. Third, the scientific literature indicated that five of the whales likely remained dependent on their mothers for nursing at the time of capture, contrary to the MMPA's flat ban on importing such animals. Was NMFS arbitrary in denying

an import permit to the Aquarium where it failed to meet its burden of showing that the statutory and regulatory requirements for the permit were met and that the permit was consistent with the main purpose of the MMPA to protect marine mammals in the wild? The answer is no.

### Statement of Facts

On June 15, 2012, the Aquarium submitted an application to import 18 live-captured beluga whales from the Sakhalin-Amur stock of beluga whales in the Russian Sea of Okhotsk. AR Doc. 8927 ("Application.") at 14305. This application, which proposed the mass import of 18 whales captured from a single wild stock, was unprecedented. Prior to this, it had been at least 25 years since NMFS had received a permit application for removal of whales from the wild for public display, and many years since NMFS had received an import permit for wild-caught whales that had not already been held in public display.

In other respects, the Aquarium's application presented unique issues. Beluga whales in the Sea of Okhotsk have long been subject to adverse human impacts. Extensive whaling in Sakhalin Bay occurred over a period of 25-30 years prior to and just after World War II, with removal of over 20,000 belugas. AR Doc. 8998 ("Decision") at 17452. Based on the harvest data, the population of the Sakhalin-Amur stock was "at least" 13-15,000 whales during this period. Id. By comparison, the stock recently was estimated to have a minimum population size

2

of only 2,972 whales. Id. at 17448. Given the stock's current size far below its documented numbers before human exploitation, the existing data suggests the stock "would be considered depleted," or below its optimal sustainable population that is the goal of the MMPA. Id. at 17427; 16 U.S.C. § 1361(6).

While commercial whaling in the Sea of Okhotsk ceased in the early 1960s, live captures of beluga whales for public display began at Sakhalin Bay in 1986 and, since 1992, when Canada stopped providing belugas for captive facilities, Russia has been the sole regular supplier of belugas to the public display industry. Decision at 17433, 17444. But the number of belugas captured from the stock between 1986 and 1999 for public display and other purposes is unknown. Id. at 17444. From 1990-2010 at least 237 belugas were exported from Russia. Id. From 2000-11, the number of belugas removed per year from the Sakhalin-Amur stock averaged 21.3 whales and was increasing. Id.; AR Doc. 8999 ("EA") at 17472-73.

While some data exists regarding recent live captures, data is limited regarding the stock's population trend over time. Decision at 17443, 17428. Hard data also is lacking regarding other take and human-caused mortality to the stock – from subsistence hunting, incidental mortality by the Russian capture operation, fishing bycatch, vessel strikes, climate change, and pollution. Id. at 17445-47 ("monitoring of other types of take in this region is low, if existent at all"). As NMFS summarized, the available information "is considered data-poor and has

3

considerable uncertainty. There is very little documented information about past abundance levels that can be compared to the present and there is limited information on past and current threats to this population." Id. at 17443.

On August 5, 2013, NMFS denied the Aquarium's permit application, finding that the Aquarium had failed to meet its burden under the MMPA and regulations of showing that the statutory and regulatory criteria for issuance of the permit were met. AR Doc. 8997 ("Letter") at 17414-15; Decision at 17439-40. First, NMFS found that the Aquarium had failed to show that the proposed import, by itself or in combination with other activities, will not likely have a significant adverse impact on the Sakhalin-Amur stock. 50 C.F.R. § 216.34(a)(4). Based on its "integration of all the available data," NMFS could not "discount the likelihood" that the stock had a "small, but steady and significant decline over the past two decades" from the ongoing captures and other take and human-caused mortality. Decision at 17440, 17449-50. In fact, NMFS found that the available data indicates "that the level of total removal, including past and present live capture operations, have likely contributed to an adverse impact on this population." Id. at 17414.

Second, the Aquarium had not shown that the requested imports will not likely result in the taking of marine mammals beyond those authorized by the permit. 50 C.F.R. § 216.34(a)(7). NMFS stated that "the point of this criterion is that the foreign shipping facility will not replace these animals with additional

4

animals of the same species." Decision at 17424. NMFS noted that for previous imports of beluga whales (from Mexico, Germany, and Canada), "the shipping facilities in those countries have provided assurances that additional animals would not be acquired as a result of the import." Id. By contrast, the live capture operation in the Sea of Okhotsk was expected to continue, and thus there was no assurance that "an additional 18 whales would not be captured in the future" from the Sakhalin-Amur stock to replace the whales proposed for import. Id.

Third, NMFS found that the Aquarium had not shown that five of the 18 beluga whales – which were estimated to be 1.5 years old at the time of capture – were independent of their mothers and thus not nursing, as necessary in order to legally import them under the MMPA and the agency's regulations. Decision at 17424. NMFS found that "[t]he scientific literature supports a conclusion that beluga calves are nursed for two years and may continue to associate with their mothers for a considerable time thereafter." Id. at 17426.

## Legal Background

## I.    The Marine Mammal Protection Act and Implementing Regulations

**Purposes of the MMPA.** The main purpose of the MMPA is to protect marine mammals in the wild from human activities. At the time of its enactment, Congress found that marine mammals are "resources of great international significance" but that "certain species and population stocks of marine mammals

are, or may be, in danger of extinction or depletion as a result of man's activities." 16 U.S.C. § 1361(1), (6). To prevent such depletion and extinction, the MMPA provides that "the primary objective of [marine mammal] management should be to maintain the health and stability of the marine ecosystem" and that the "goal" is for marine mammal stocks to reach their "optimum sustainable population." Id.[1]

**Marine Mammal Import Permits**. Consistent with these purposes, Section 101 of the MMPA establishes a moratorium on the taking and importation of marine mammals. 16 U.S.C. § 1371. But "the moratorium can be modified by regulations and permits that are consistent with the goal of protecting marine mammals." Comm. for Humane Legislation v. Richardson, 414 F. Supp. 297, 300-01 (D.D.C. 1976), aff'd, 520 F.2d 1141 (D.C. Cir. 1976). Under Section 104 of the MMPA, NMFS may issue permits for the taking[2] or importation of marine mammals for scientific research, enhancing the survival or recovery of a species or stock, or public display, provided that the requirements are met. 16 U.S.C. § 1374.

As most pertinent here, Section 104(d)(3) of the MMPA requires that "[t]he applicant for any permit under this section must demonstrate . . . that the taking or

---

[1] "[O]ptimum sustainable population" is "the number of animals which will result in the maximum productivity of the population or the species, keeping in mind the carrying capacity of the habitat and the health of the ecosystem of which they form a constituent element." 16 U.S.C. § 1362(9).

[2] Under the MMPA, "take" means "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." 16 U.S.C. § 1362(13).

importation of any marine mammal under such permit will be consistent with the purposes of this chapter and the applicable regulations established under section 1373 of this title." 16 U.S.C. § 1374(d)(3); see also id. at § 1374(b)1). Pursuant to its authority under the MMPA, NMFS has issued regulations providing "issuance criteria" for such permits. 50 C.F.R. § 216.34. The two criteria that NMFS found were not met here are:

1) "[t]he proposed activity by itself or in combination with other activities, will not likely have a significant adverse impact on the species or stock" (50 C.F.R. § 216.34(a)(4)); and

2) "[a]ny requested import or export will not likely result in the taking of marine mammals or marine mammal parts beyond those authorized by the permit" (50 C.F.R. § 216.34(a)(7)).

In addition, Section 102(b) of the MMPA prohibits the import of any marine mammal for public display that was: (1) pregnant at the time of taking; (2) nursing at the time of taking, or less than eight months old, whichever occurs later; (3) taken from a species or population stock which NMFS has designated as depleted;[3] or (4) taken in a manner deemed inhumane. 16 U.S.C. § 1372(b). See also 50 C.F.R. § 216.12 (providing the same).[4] Section 104 of the MMPA also has other

---

[3]   After denying the permit, NMFS was petitioned to formally designate the Sakhalin-Amur stock as depleted and found that the petitioned action may be warranted, but has not yet made a decision. 79 Fed. Reg. 44,733 (Aug. 1, 2014).

[4] The MMPA allows permits for the importation of pregnant or nursing marine mammals if necessary for the protection or welfare of the animal. 16 U.S.C. § 1372(b). The Aquarium did not claim this exception is applicable in this case.

requirements for permits for public display that are not at issue in this appeal. See 16 U.S.C. §§ 1374(b)(2), (c)(1), (c)(2)(A).

**The Burden of Proof**. As NMFS stated, "it is the [permit] applicant's responsibility, not that of NMFS, to demonstrate that the MMPA criteria have been met." Decision at 17421. See 16 U.S.C. 1374(d)(3); 50 C.F.R. § 216.34 (stating "the applicant must demonstrate that" the issuance criteria are met). Explaining the effect of this requirement, the House Report to the MMPA states:

> In every case, the burden is placed upon those seeking permits to show that the taking should be allowed and will not work to the disadvantage of the species or stock of animals involved. If that burden is not carried – and it is by no means a light burden – the permit may not be issued. The effect of this set of requirements is to insist that the management of the animal populations be carried out with the interests of the animals as the prime consideration.

H.R. Rep. No. 92 – 707, supra note 7, at 18, reprinted in 1972 U.S.C.C.A.N. 4151. See also Comm. for Humane Legislation, 414 F. Supp. at 303 (the MMPA "imposes a strict burden of proof on each applicant seeking to take or import marine mammals").

## II.   Standard of Review

The standard of review applicable to this case is provided by the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, which states that a court may set aside agency action that is "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). As the Eleventh

Circuit has explained, "this standard is exceedingly deferential":

> Along the standard of review continuum, the arbitrary and capricious
> standard gives an appellate court the least latitude in finding grounds
> for reversal; '[a]dministrative decisions should be set aside in this
> context . . . only for substantial procedural or substantive reasons as
> mandated by statute,  . . . not simply because the court is unhappy
> with the result reached.' The agency must use its best judgment in
> balancing the substantive issues.

Fund for Animals v. Rice, 85 F.3d 535, 541-42 (11th Cir. 1996) (quoting N.

Buckhead Civic Ass'n v. Skinner, 903 F.2d 1533, 1538–39 (11th Cir.1990)).

The overarching question is whether the "agency examined the relevant data

and articulated a 'rational connection between the facts found and the choice

made.'" Viraj, LLC v. Holder, No. 2:12–CV–00127–RWS, 2013 WL 1943431, at

*6 (N.D. Ga. May 8, 2013) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut.

Auto. Ins. Co., 463 U.S. 29 (1983)), aff'd 578 F. App'x 907 (11th Cir. 2014).

Further, scientific determinations are entitled to greater deference. Baltimore Gas

& Elec. Co. v. Natural Res. Def. Council, 462 U.S. 87, 103 (1983).

## **Argument**

NMFS articulated a rational connection between the scientific facts found

and the choice made, and thus its decision should be upheld under the APA

standard of review. As NMFS correctly found, the Aquarium had the burden to

demonstrate that the permit issuance criteria were met and that the permit was

9

consistent with the main purpose of the MMPA to protect marine mammals in the wild. The Aquarium failed to make that showing.

First, as NMFS found, data were not available showing that the Sakhalin-Amur stock of beluga whales was increasing or stable in the face of ongoing live captures for public display and other human-caused mortality. NMFS' expert analysis found the exact opposite: that the live captures and other mortality likely are having an adverse impact and preventing the stock from reaching its optimum sustainable population. The Aquarium therefore failed to show that the imports, in combination with other human activities, were not likely to have a significant adverse impact on the stock, and that issuance of the permit would be consistent with the purposes of the MMPA. This failure alone was a sufficient basis for NMFS to deny the permit under the MMPA and implementing regulations.

Second, consistent with its established interpretation of the relevant permit issuance criteria (50 C.F.R. § 216.34(a)(7)) and the purposes of the MMPA, NMFS required the Aquarium to show that the proposed imports would not result in additional removals of beluga whales to replace those proposed for importation into the United States. But the Russian live-capture operation that removed the 18 whales proposed for import has been ongoing for more than two decades, continues to remove beluga whales, and no assurance existed that it would not remove more belugas from the stock to replace those proposed for importation.

Without a showing that no replacement takes would occur, the permit could not issue regardless of whether the permit met the other legal requirements.

Third, NMFS relied on scientific literature indicating that five of the whales likely were nursing at the time of capture, and thus could not be legally imported under the MMPA and the regulations. The agency's decision on all three points is well-reasoned and supported by the record. The Aquarium's arguments to the contrary lack a basis in the record and the law and should be rejected by this Court.

## I.     The Aquarium Failed to Show That the Imports, in Combination with Other Activities, Are Not Likely to Have a Significant Adverse Impact

The Aquarium was required to show that "[t]he proposed activity by itself or in combination with other activities, will not likely have a significant adverse impact on the species or stock." 50 C.F.R. § 216.34(a)(4). NMFS' analysis of this criterion was complicated by the lack of reliable reported data regarding the population trend of the Sakhalin-Amur stock over time and the lack of monitoring of other take and human-caused mortality in the region. NMFS was left looking for clues and reading between the lines of the limited data. But what it pieced together upon careful examination was troubling and supported denial of the permit.

### A.     NMFS Reasonably Found Evidence of an Adverse Impact on the Stock from Live-Capture Removals and Other Human Activities

In its application, the Aquarium unequivocally stated and cited supporting scientific literature that in 1989, the Sakhalin-Amur aggregation of belugas was

"the largest group anywhere in the Sea of Okhotsk." Application at 14316. But according to recent and reliable surveys in 2009-10, the separate Shantar stock of belugas in the Sea of Okhotsk is about <u>twice</u> as large as the Sakhalin-Amur stock: 6,661 whales for Shantar versus 2,972 whales for Sakhalin-Amur. Decision at 17447-48. That was <u>not</u> the case in 1989 according to the Aquarium's own application and the literature cited by the Aquarium – which said the Sakhalin-Amur stock was the largest in 1989. From 1989-2010, something had caused the Sakhalin-Amur stock to shrink in size relative to the Shantar stock.

NMFS evaluated three scenarios to investigate this concerning development. In the first, using an estimate of the annual percentage increase in beluga whale populations, NMFS calculated backwards from the accepted minimum population size of the Shantar stock in 2010 (6,661) to determine an estimated size for that stock in 1990 (2,944). Decision at AR17448-49. In this scenario, NMFS reasoned that by comparison the Sakhalin-Amur stock had to be larger than 3,000 whales at that time – consistent with the scientific literature in the Aquarium's application stating that Sakhalin-Amur was the larger of the two stocks in 1989. <u>Id.</u> at 17448. But NMFS noted that even assuming only a somewhat larger population of 3,500 whales for the Sakhalin-Amur stock in 1990, given the stock's minimum population size of 2,972 whales in 2010, "there would have been an average

decline of the Sakhalin-Amur stock of 25 whales per year, or slightly less than 1% per year during the period from 1990 to 2010." Id.

In the second scenario, NMFS calculated back from the accepted minimum population size of the Sakhalin-Amur stock in 2010 (2,972). Using that method, it calculated an estimated size for the stock of approximately 1,314 whales in 1990. Id. at 17449. NMFS noted that this scenario "results in an impossible contradiction between available historical data and current data." Id. In this scenario, the Shantar stock necessarily would have been smaller than the back-calculated 1,314 whales for the Sakhalin-Amur stock – given the scientific literature cited by the Aquarium stating that the Shantar stock was smaller in this timeframe. But a Shantar stock of that size in 1990 simply could not increase to its present numbers: "there is no manner in which the Shantar stock  . . . could increase during the same period of time to its current, accepted abundance level of greater than 6,000 whales." Id.

In a third scenario, NMFS conservatively assumed that both stocks were at 3,000 whales in 1990 – even though the scientific literature cited in the Aquarium's application states that the Sakhalin-Amur stock was larger. NMFS found that in this scenario, the Sakhalin-Amur stock "would still have had to lose its total production per year (that is, 120 whales) to remain at [approximately] 3,000 whales in 2010." Id. All three scenarios pointed to a decline in the stock.

13

Based on this analysis, NMFS found that the ongoing live captures removals from the Sakhalin-Amur stock, in combination with other untracked human-caused mortality, is likely having an adverse impact on the stock:

> [B]ased on an integration of all the available data, we believe that total removals from the Sakhalin-Amur stock have [likely] exceeded . . . the total net production [(or natural increase in the stock)], on a regular basis resulting in a small, but steady and significant decline over the past two decades. As indicated above, there are several potential sources of human-caused mortality that may have produced this decline, and the live captures of beluga whales cannot be discounted as a possible contributing factor. Regardless of the source of the decline, the result is a net loss of whales per year throughout the 20 year period which has gone undetected because of the lack of monitoring in this region during the period.

Id. at 17449-50. As NMFS concluded, "[s]ince the available information does not support a conclusion that the stock is stable or increasing, the record does not support a finding that the proposed activity is sustainable." Id. at 17450.

### B.    The Aquarium's Challenges to NMFS' Analysis of Likely Adverse Impact Are Contradicted by the Record

The Aquarium argues that NMFS' expert analysis is incorrect. Specifically, the Aquarium claims that NMFS made "an improper comparison" of "(1) historic population estimates derived from multiplying the number of whales sighted on the surface during an aerial population survey by a correction factor of 12 (to account for unseen and submerged animals)" with "(2) current population estimates derived from multiplying the number of sighted whales by only 2." Pl. Br. at 3, 20-22 (ECF

No. 55). That is not true. Looking at NMFS' discussion of population trends (Decision at 17447-17450), there is no comparison of estimates calculated using different survey correction factors. As discussed above, NMFS instead relied on: (1) scientific literature from 1989 regarding the relative sizes of the stocks at that time, which is unaffected by the use of different correction factors back then versus in 2010, and (2) estimates of the two stocks' numbers in 1990 derived from their current, minimum population sizes in 2010, which again does not compare survey results from different time periods using different correction factors. The Aquarium is simply wrong. NMFS was well aware of the correction-factor issue and avoided it in analyzing trends in the two stocks over time.

The Aquarium also makes three other erroneous arguments regarding NMFS' population trend analysis. First, the Aquarium argues that the Sakhalin-Amur stock is actually increasing if one re-calculates the estimated 2010 population size for the stock using the 12X correction factor used in older surveys for the stock. Pl. Br. 20-21. But as NMFS noted, more recent research indicates that the correction factors used for the older surveys are "likely inflated." Decision at 17451. In addition, the correction factor was not the only difference between past and more recent surveys that NMFS found foreclosed a "direct comparison" of their results. Id. NMFS noted that "different survey methodologies" had been

15

used for the older versus more recent surveys, id., which prevents any direct substitution of correction factors used for one survey with those used for another.

Second, the Aquarium claims that even if the Sakhalin-Amur stock declined over the period from 1990-2010, there is no evidence that it continues to decline today. Pl. Br. 19. But as the Aquarium admits, the majority of the 18 whales were captured during this period in 2006 and 2010 (with the remainder in 2011). Pl. Br. 23. Moreover, NMFS' analysis shows that the ongoing live captures for public display and other untracked human-caused mortality likely are having an adverse impact, and the Aquarium points to no information that factors affecting the stock have changed. The removals have been occurring for over 30 years, are ongoing and indeed increasing, and thus are expected to continue. There also is no evidence that other factors impeding the stock have changed. Under the burden of proof here, the Aquarium had to identify and show some change in circumstances that would warrant a conclusion that the threats to the stock have abated.

Third, the Aquarium claims that NMFS' purported "evidentiary standard of 'possibility' regarding a population decline" from live-capture removals and other mortality is unlawful. Pl. Br. 30, n.25, 40, n.28. But as the Aquarium stated in its own application, "[s]ustainable removal is the fraction of the population that could be annually removed for human uses without initiating a population decline." Application at 14324 (emphasis in original). NMFS thus properly required the

16

Aquarium to eliminate the possibility of a decline. Decision at 17450. The Aquarium failed to do so. Moreover, NMFS found that what limited data was available indicated that the ongoing live-capture removals and other mortality likely are having a significant adverse impact on the stock. Id. at 17440 (referring to a "likelihood that total removals . . . have exceeded the total net production on an annual basis resulting in a small, but steady and significant decline over the past two decades"). NMFS was therefore unable to make the required finding of no likely adverse impact under 50 C.F.R. § 216.34(a)(4); Decision at 17450.

NMFS' determination that the Aquarium failed to make the requisite showing of no likely adverse impact on the stock is fully explained, supported by the available record evidence, and is a judgment entitled to deference under the standard of review. "The Supreme Court has instructed us that when an agency "is making predictions, within its area of special expertise, at the frontiers of science . . . as opposed to simple findings of fact, a reviewing court must generally be at its most deferential." Miccosukee Tribe of Indians v. United States, 566 F.3d 1257, 1264 (11th Cir. 2009) (citation omitted).

## C.   NMFS Reasonably Declined to Rely on the Aquarium's PBR

While raising a few erroneous claims regarding alleged defects in NMFS' population trend analysis, the Aquarium's principal argument on appeal is that even if the Sakhalin-Amur stock is declining, NMFS was required to find no likely

adverse impact on the stock based on a relatively simple calculation known as potential biological removal ("PBR").[5] Pl. Br. 9-10, 32. But PBR is only one potential tool for assessing the sustainability of human impacts on marine mammals and is not appropriate in all circumstances. It is not a mandatory method under the MMPA, the regulations, and certainly not as a matter of agency practice in the context of an import permit for public display like that here. The agency had not reviewed an import permit for multiple wild-caught whales for public display since the addition of PBR to the MMPA. And here NMFS articulated three valid grounds for not relying on the Aquarium's proposed PBR comparison.

> ### 1. NMFS Articulated Three Grounds for Not Relying on the Aquarium's Proposed PBR Comparison
>
> #### a. The Evidence of A Decline In the Stock Shows That PBR Likely Is Being Exceeded

First, the underlying assumption or prediction of PBR is that total take and human-caused mortality below PBR will allow the stock to increase. As the agency explained, "an underlying assumption in the application of the PBR equation is that the stock will naturally grow and that some surplus growth may be removed while still allowing recovery." Decision at 17447. But as explained above, other evidence – including the reversal in the relative sizes of the Sakhalin-Amur and Shantar

---

[5] PBR is calculated by multiplying: (1) the minimum population estimate of the stock; (2) one-half the net productivity rate of the species; and (3) the recovery factor. 16 U.S.C. § 1362(20).

stocks – indicated that the Sakhalin-Amur stock likely was declining from the continuing live capture removals and other untracked human-caused mortality, i.e., that PBR in fact is being exceeded. Decision at 17449-50. NMFS decided it could not rely on the Aquarium's assumption of an increasing population based on PBR in the face of this contrary evidence (id. at 17447-50), particularly in light of the Aquarium's burden and the purposes of the MMPA to protect wild stocks. Id. at 17416-17, 17439-40. That determination is completely reasonable.

> **b.** **The Live Captures for Public Display Plus Other Human-Caused Mortality Likely Exceed PBR**

NMFS also identified a major flaw in the Aquarium's application: its proposed PBR comparison assumed that the stock was experiencing no other human-caused mortality. Decision at 17446. Relying on an asserted absence of data about other sources of mortality, the Aquarium compared its proposed PBR to the annual average live captures alone. Application at 14337. That comparison did not account for other human-caused mortality that, when added to live captures, could cause PBR to be exceeded and the stock to decline – as NMFS' analysis shows likely has occurred. Decision at 17447-17450. NMFS rejected a comparison based on live captures alone because, "[a]lthough the full extent of other sources of mortality cannot be determined, it cannot be fully discounted or assumed to be zero." Id. at 17445. Indeed, NMFS identified multiple potential sources of other

19

human-caused mortality, including subsistence hunting, incidental mortality from the live-capture removals, incidental bycatch of beluga whales from entanglement with fishing gear, vessel strikes, climate change, and pollution. Id. at 17445-47.

With respect to subsistence hunting, NMFS cited evidence from a Russian researcher that villages in the Sea of Okhotsk region engage in an unquantifiable amount of illegal harvest of beluga whales. Id. at 17445-46.[6] Instances of beluga whale entanglements in coastal salmon traps, beach-set salmon gillnets, and illegal sturgeon nets have been reported by local fishermen. Id. at 17446; AR Doc. 8915 at 13785. Over just a four-year period, at least one known mortality occurred during live-capture operations. AR17446. Pollution also may be affecting belugas – such that a panel chosen by the International Union for the Conservation of Nature and Natural Resources ("IUCN") recommended monitoring of the stock for contaminant loading and testing for reactions to toxins. AR Doc. 8915 at 17447; AR Doc. 8922. Such contaminant loading is known to cause high rates of cancer in

---

[6] Based on selected excerpts of a document that is not part of the administrative record, the Aquarium asserts that the villages that hunt belugas are located in the "Shantar region" rather than the "Sakhalin-Amur area." Pl. Br. 27. Contrary to the Aquarium's assertion, NMFS did not "exclude" parts of this document from the record. Pl. Br. 21 n.16. Different versions of the document exist, and the abbreviated version in the record is all that the Aquarium submitted to NMFS. AR Doc. 8934 at 15896-932. In any event, the Shantar and Sakhalin-Amur areas are adjacent on the coast of the Sea of Okhotsk, and there is no reason to believe that villages in one area hunt but villages in the other do not. AR Doc. 8915 at 13779.

belugas. AR Doc. 8923 at 13915. Climate change in the Arctic also is occurring, with an unknown impact on belugas and their habitat. AR Doc. 8908.

The Aquarium asserts there is no evidence of other human-caused mortality to the Sakhalin-Amur stock. Pl. Br. 26-30. That is not accurate. In addition to the evidence cited above, NMFS' analysis of the population trend for the Sakhalin-Amur stock is evidence that human actions other than live captures are adversely impacting the stock. Decision at 17447-50. At most there is a lack of evidence of the exact source and amount of other mortality. Given the lack of reliable monitoring in the region, NMFS reasonably declined to rely on the Aquarium's "absence-of-evidence" argument regarding other mortality. The Aquarium bore the burden of proving that the imports "in combination with other activities," will not likely have a significant adverse impact on the stock. 50 C.F.R. § 216.34(a)(4).

Also relevant is the extent to which the Aquarium's PBR comparison left room for other human-caused mortality. Here, the reported annual average live captures from the Sakhalin-Amur stock (about 22 whales per year) were relatively close to PBR (29-30 whales per year), the rate of captures were increasing, and captures actually exceeded that PBR in three years including in 2010 and 2011, when some of the whales at issue were captured. Decision at 17443-44. It would take only a very small amount of untracked illegal subsistence hunting, unreported mortality from live captures and fishing, or mortality from other potential sources

like pollution and vessel strikes, for total human-caused mortality to exceed that PBR every year. As NMFS found, the Aquarium's PBR comparison completely failed to account for other human-caused mortality. Id. at 17445-47.

To be sure, the evidence regarding other mortality is anecdotal and that evidence in isolation might have supported the opposite conclusion. But here the Aquarium's own application showed that the Sakhalin-Amur stock had shrunk in size relative to the Shantar stock, and the agency's detailed analysis indicated that human impacts were to blame. Further, where "Congress delegates power to an agency to regulate on the borders of the unknown, courts cannot interfere with reasonable interpretations of equivocal evidence." Animal Legal Def. Fund v. Glickman, 204 F.3d 229, 235 (D.C. Cir. 2000). See also Maine v. Norton, 257 F. Supp. 2d 357, 389 (D. Me. 2003) ("[W]here the scientific data are equivocal, it is the agency's prerogative 'to . . . make a policy judgment based on the scientific data.'"). Given the protective purposes of the MMPA, NMFS reasonably adopted a precautionary approach and declined to assume that no other mortality occurs.

### c.   The Aquarium's PBR Comparison Is Not Appropriate in this Data-Poor Situation

While the foregoing is more than adequate to support the agency's decision, NMFS found an additional reason not to rely on the Aquarium's proposed PBR comparison in the International Council for the Exploration of the Sea ("ICES")

framework. While not treating this framework as "controlling," NMFS identified it "as an additional tool to examine the sustainability of the proposed activity." Decision at 17450. Under this framework, stocks without a recent time series of at least three population estimates are considered "data-poor." Id. That describes the Sakhalin-Amur stock because there is no time series of recent estimates. Under the framework, if a stock only has one recent estimate, then PBR is appropriate only if that estimate is greater than 30% of the historical maximum size of the stock. Id.

NMFS found that the 2010 minimum population size of the Sakhalin-Amur stock (2,972) was below 30% of 10,000 whales – which NMFS considered the "lower end of an historical maximum" for the stock based on the "reliable commercial harvest data" indicating that the stock was "at least" 13-15,000 whales during the period of intensive whaling prior to and just after WWII. AR17452. Therefore, PBR was not an appropriate measure of sustainability. Id.

The Aquarium claims that in applying the ICES framework, NMFS compared population estimates calculated using different survey correction factors. Pl. Br. 19-22. That again is simply not true. In applying the framework, NMFS discussed the 1989 estimate that used a different correction factor than the 2010 one, but did not rely on a simple comparison of those estimates. Indeed, NMFS stated that "[t]he use of different survey methodologies and application of correction factors between surveys, at a minimum, complicates a direct comparison

23

between the results" and that "a direct comparison of the estimates is not possible." Decision at 17451. NMFS therefore looked to the whaling data from prior to and just after WWII indicating that the stock was "at least" 13-15,000 whales during that period. Id. at 17451-52. The stock's 2010 estimate of 2,972 whales is less than 30 percent of even the bottom end of that range.

The Aquarium also contends that NMFS improperly compared the stock's accepted 2010 minimum population estimate with its historical maximum size. Pl. Br. 18. But the entire point of the framework is to measure a recent population estimate for the stock against its known, maximum size before impacts from human activities. Decision at 17450-51 ("allowing harvests or removals at a PBR level under the ICES protocol is contingent upon the stock's abundance status with respect to the historical maximum"). NMFS also reasonably used the 2010 minimum population estimate for the stock. That is the very same estimate that was used for the Aquarium's proposed PBR calculation. Application at 14335.

A "minimum" population estimate also is more conservative compared to an "actual" estimate that is subject to natural year-to-year variation. See 16 U.S.C. § 1362 (27) (defining the "minimum population estimate" as the number of animals that is (1) "based on the best available scientific information on abundance, incorporating the precision and variability associated with such information" and (2) "provides reasonable assurance that the stock size is equal to or greater than the

estimate." In this case, a higher "actual" population estimate for the Sakhalin-Amur stock was available, based on surveys conducted in September 2009 and August 2010. AR Doc. 8915 at 13805. The 2010 minimum population estimate was derived from the same survey data, see Application at 14335, but represents a more conservative measure less susceptible to natural variation over time. NMFS appropriately used a more precautionary population estimate given the purpose of the MMPA to protect marine mammals in the wild. [7]

The Aquarium also argues that an IUCN panel concluded that the live-capture removals were sustainable based on PBR. Pl. Br. 23-26. But NMFS is entitled to rely on the views of its experts even if some contrary views exist. Am. Wildlands v. Kempthorne, 478 F. Supp. 2d 92, 96 (D.D.C. 2007) ("'[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.'") (quoting Marsh v. Or. Natural Res. Def. Council, 490 U.S. 360, 378 (1989)). In addition, the panel emphasized that "[a]ny animals taken by humans, including those killed or injured in fishing

---

[7] In any event, even the "actual" 2010 estimate of 3,961 whales for the stock is only 30.5% of the bottom end of the stock's historical maximum prior to and just after WWII – which was "at least" 13-15,000 whales. Decision at 17452. That is not a compelling basis for relying on PBR given the likely decline in the stock and the Aquarium's failure to account for other human-caused mortality.

gear, struck by vessels, or accidentally drowned during live-capture operations, should be considered when evaluating the sustainability of any level of intentional removals." AR Doc. 8915 at 13786. Had the panel been aware of NMFS' later analysis that other human-caused mortality likely was affecting the stock and PBR likely was being exceeded, the panel might well have agreed with NMFS.[8]

Moreover, "[t]he court's role is to ensure that the agency came to a rational conclusion, 'not to conduct its own investigation and substitute its own judgment for the administrative agency's decision.'" Defenders of Wildlife v. U.S. Dep't of Navy, 733 F.3d 1106, 1115 (11th Cir. 2013) (citations omitted). In this case, NMFS articulated more than a sufficient basis for not relying on PBR. The Aquarium asks this Court to substitute its judgment regarding the weight accorded to PBR versus other scientific evidence, at odds with the Supreme Court and Eleventh Circuit case law. Fund for Animals, 85 F.3d at 541; Miccosukee Tribe, 566 F.3d at 1264; Baltimore Gas & Elec., 462 U.S. at 103.

---

[8] The Aquarium also relies on comments of the Marine Mammal Commission ("MMC"). Pl. Br. 1. But MMC articulated multiple concerns about the Aquarium's proposed PBR comparison. With respect to other human-caused mortality, MMC called the Aquarium's "absence-of-evidence" argument not "compelling." AR Doc. 8730 at 10095. MMC also stated that "if the population is declining," the Aquarium's PBR using "an assumed maximum growth rate would be inappropriate." Id. MMC further stated that if the stock was depleted (regardless of whether formally designated as such) – which NMFS found it likely was – the imports should not occur. Id. at 10094; Decision at 17427.

26

### 2.    The MMPA, Regulations and Agency Practice Do Not Mandate Reliance on PBR in This Case

The Aquarium also argues that NMFS has a "practice and policy" of using PBR to assess the sustainability of impacts on declining marine mammal stocks. Pl. Br. 11-16. First, this argument need not even be reached by the Court. As explained above, NMFS found that PBR likely has been exceeded, leading to a decline in the stock. Reliance on PBR to determine sustainability would not lead to a different outcome. In any event, the Aquarium significantly overstates NMFS' limited use of PBR in some other cases. NMFS certainly has not previously relied on PBR for an import application for public display like that here. Indeed, NMFS has not received a permit application like this one since before PBR was added to the statute and the applicable regulations were adopted. The Aquarium's argument also ignores the narrow prescribed role of PBR in the MMPA.

PBR was added to the MMPA as a U.S. commercial fisheries management tool, not as a test governing the import of marine mammals for public display. In 1994, Congress enacted MMPA Section 118 to "establish a new regime governing the incidental taking of marine mammals in commercial fishing operations." S. Rep. No. 103-220 at 1, reprinted in 1994 U.S.C.C.A.N. 518 (1994). Congress added the definition of PBR "for the purpose of implementing" the new fisheries provisions, id. at 534-35, and required PBR to be specified in stock assessment

27

reports for marine mammal stocks affected by U.S. fishing operations, id. at 530-31. While PBR is defined in Section 3 of the MMPA, the term is used only in Sections 117 and 118 regarding stock assessment reports and marine mammal take reduction plans for U.S. fisheries. Id. at 531; 16 U.S.C. § 1386(a)(6); 16 U.S.C. §§ 1387(f)(2)-(3), (5), (7), (8). Sections 103 and 104 – which govern the import and taking of marine mammals outside of the U.S. fisheries context – contain no reference to PBR, and instead provide NMFS with broad authority to deny permits consistent with its regulations and the purposes of the MMPA. 16 U.S.C. § 1374(d)(3). Nor do the applicable regulations refer to PBR. 50 C.F.R. § 216.34.

Consistent with Sections 117 and 118 of the MMPA, NMFS historically has used PBR in the U.S. commercial fisheries context. While the Aquarium's brief suggests there are a large number of cases where NMFS considered PBR outside of that context, see Pl. Br. 11-17, the documents cited by the Aquarium involve the same two species and same type of activity merely for different years: (1) scientific research for Steller sea lions listed under the Endangered Species Act ("ESA"); (2) scientific research for depleted northern fur seals; and (3) native subsistence take of northern fur seals that is exempted from the MMPA 16 U.S.C. § 1371(b).

NMFS' discretionary consideration of PBR in a handful of situations involving scientific research and subsistence take do not establish a "practice and policy" of relying on PBR in all circumstances. Indeed, NMFS has no practice of

28

relying on PBR in this context given that the Aquarium's application to import marine mammals captured for the purpose of sale and/or exportation for public display is the first such application NMFS has received since the 1994 addition of PBR to the statute and the 1996 adoption of the regulatory criteria. All other import permits for public display considered by NMFS over the past two decades have involved importation of marine mammals that were captive born or had already been in public display in the foreign country for some time. The Aquarium's application is the first of its kind to be reviewed under the issuance criteria.

Moreover, with the exception of exempted Alaskan native subsistence take, the instances cited by the Aquarium involve scientific research permits. While scientific research and public display import permits are both granted under section 104 of the MMPA, the statute does not treat them the same. Rather, the MMPA places fewer constraints on scientific research permits, which primarily are aimed at maintaining the health of wild marine mammal populations and the ecosystems on which they depend. For example, the MMPA makes an exception to its ban on importing pregnant or nursing mammals, if such import is necessary for scientific research. 16 U.S.C. § 1372(b). Similarly, the MMPA allows for scientific research purposes imports of animals from depleted stocks, or of animals taken in a manner deemed inhumane by the Secretary. Id. The MMPA prohibits such imports for purposes of public display. Id. Likewise, the MMPA allows scientific research

29

permits to be issued before the end of the required public comment period, if necessary to avoid injury or loss of unique research opportunities. Id. § 1374(c)(3)(A). The MMPA even allows lethal take of animals for research in some circumstances. Id. § 1374(c)(3)(B). This reflects a decision by Congress that the taking of marine mammals for scientific research is necessary in some situations where the taking of those same animals for public display is not, consistent with the primary purpose of the MMPA to protect marine mammals in the wild.

In these other cited situations, NMFS also did not identify PBR as a talismanic test of sustainability as the Aquarium claims. In fact, in its 2007 final environmental impact statement for scientific research on Steller sea lions and northern fur seals, NMFS identified PBR as only "an upper threshold level of mortality" and stated that it was not "obligated to authorize takes up to these threshold levels . . . . These upper limits will be used only as guidelines for the permitting process."[9] For subsistence take of northern fur seals, NMFS found that

---

[9] Steller Sea Lion and Northern Fur Seal Research, Final Programmatic Environmental Impact Statement (May 2007), at 2-22 (emphasis added), available at http://www.nmfs.noaa.gov/pr/pdfs/permits/eis/fpeis.pdf. NMFS also relied on mitigation for the research in concluding that it would not have an adverse impact. Record of Decision Steller Sea Lion and Northern Fur Seal Research Final Programmatic Environmental Impact Statement (June 2007) at 10-11, available at http://www.nmfs.noaa.gov/pr/pdfs/permits/eis_decision.pdf. The Aquarium also cites a partial except of the June 2014 environmental assessment for Steller sea lion research. Pl. Br. 14-15; ECF No. 55-3. As the full document shows, the agency relied on evidence that the level of mortality was lower than anticipated in the

allowing harvest up to the level of PBR would have an adverse impact: "[a]lthough by definition and modeling, removal at or below the PBR level is expected to allow the population to recover, the unknowns combined with the decreasing population result in a conditionally significant adverse effect to the population."[10]

NMFS also plainly relied on other evidence for the activities cited by the Aquarium, not PBR alone. For research on Steller sea lions, NMFS relied on a "Biological Opinion" (which is prepared under ESA Section 7) finding that the research would not have an appreciable impact on the stock. ECF No. 55-2 at 9-10 (pp. 13-14 of the memorandum). The agency addressed PBR in responding to public comments, but not in the section addressing the permit issuance criteria. Id. For northern fur seal subsistence take, NMFS similarly relied on other evidence, noting that "all of the harvested animals, with very few exceptions, are non-breeding males and therefore do not contribute to the population growth."[11] The Aquarium overstates the importance of PBR in the cited cases.[12]

---

2007 assessment. See Environmental Assessment for Issuance of Permits to take Steller Sea Lions by Harassment During Surveys Using Unmanned Aerial Systems (June 2014) at 19-21, attached as Exhibit 3.

[10] Setting the Annual Subsistence Harvest of Northern Fur Seals on the Pribilof Islands, Final Environmental Impact Statement (May 2005) at 54, available at http://alaskafisheries.noaa.gov/protectedresources/seals/fur/eis/final0505.pdf.

[11] Id. at 53. NMFS made similar findings for the 2014-16 subsistence harvest. Final Environmental Impact Statement (August 2014), at 59 ("NMFS considers the overall mortality effects . . . to be minor because of the lower survival of young of

31

As these cases illustrate, where NMFS has considered PBR outside of U.S. fisheries management, the agency has treated PBR as only one "quantitative tool" that "does not make up the entirety of our impact assessment." Proposed Rule, Taking Marine Mammals Incidental to Southwest Fisheries Science Center Fisheries Research, 80 Fed. Reg. 8166, 8222 (Feb. 13, 2015). Even in the U.S. fisheries context, PBR was not designed as an "absolute threshold" limiting human activities. Id. Rather, PBR is used as a guideline to identify where further incidental take reduction measures are needed. Id.

The Aquarium also argues that in these few situations involving subsistence hunting and scientific research, NMFS relied on PBR notwithstanding that the stock was declining. Pl. Br. 10. But where "particular agency action does not appear to be inconsistent with prior decisions," a court is to uphold the agency's decision so long as its "path may reasonably be discerned." Hall v. McLaughlin,

---

the year and minimal reproductive contribution of males . . ."), available at http://alaskafisheries.noaa.gov/protectedresources/seals/fur/seis/fseis.pdf.

[12] The Aquarium also cites the government's briefs in a lawsuit challenging research permits for Steller sea lions. But there the government argued that NMFS had "considered" PBR – not that it was the entirety of the agency's analysis. ECF No. 55-7 (page 6 of brief). Indeed, the government argued that plaintiffs were attempting to "supplant NMFS' specialized analysis" – based on evidence that this research did not have an adverse impact on the stock – "with their preferred PBR numbers." ECF No. 55-6 at 14 (page 13 of brief). The Aquarium also cites a take reduction plan for false killer whales. Pl. Br. 14. As noted above, Section 117 of the MMPA requires use of PBR for developing take reduction plans for U.S. commercial fisheries, while no such requirement exists for import permits.

864 F.2d 868, 872-73 (D.C. Cir. 1989). That is the case here. As explained above, in the cases cited by the Aquarium, NMFS did not rely solely on PBR and cited other evidence that the activity would not have an adverse impact. By contrast, here the other evidence was at odds with a conclusion that the activity was sustainable based on PBR. The evidence showed that the Sakhalin-Amur stock – only two decades ago the largest in the Sea of Okhotsk – was now half the size of the Shantar stock. Decision at AR17448-49. And NMFS' analysis indicated that the live-capture removals and other, untracked human-caused mortality likely caused the decline. Id. at 17447-50. And while an agency must explain departures from established practice, NMFS has no practice of relying on PBR to the exclusion of all other evidence to determine sustainability for permits issued under Section 104 of the MMPA. Indeed, there is no precedent at all for using PBR to decide whether to grant an import permit like the one sought by the Aquarium.

NMFS also did not apply a "new" standard to the Aquarium by considering but declining to rely on PBR in the circumstances of this case. It applied the standard in the regulations: "[t]he proposed activity by itself or in combination with other activities, will not likely have a significant adverse impact on the species or stock." 50 C.F.R. § 216.34(a)(4). And NMFS is accorded great latitude in weighing scientific evidence, especially where the evidence is mixed. Miccosukee Tribe, 566 F.3d at 1264; Animal Legal Def. Fund, 204 F.3d at 235.

The Aquarium's argument that NMFS is legally required to reduce its analysis to some single litmus test like PBR – to the exclusion of all other evidence of an adverse impact on a marine mammal stock – has no basis in the statute or agency practice and is flatly contrary to the standard of review.

### D.     The Aquarium Cannot Rewrite Its Permit Application on Appeal

In a last-ditch effort on PBR, the Aquarium argues for the first time on appeal that NMFS used an "artificially low" PBR (30 instead of 46). Pl. Br. 30-32. But the Aquarium proposed the PBR of 30 in its own permit application. Application at 14284, 14296, 14335-37. That PBR was developed by the IUCN panel based on the 2010 minimum population estimate of 2,972 using aerial survey and population estimation data collected by Dr. Olga Shpak. Id; AR Doc. 8915. The Aquarium's application states: "[a]s described in Appendix A accompanying this permit application, subsequent research and data analysis recommended by the IUCN panel indicate that the appropriate PBR is 30." Application at 14296.

The Aquarium never amended its application to propose a higher PBR. Rather, it merely argued in response to public comments during the administrative process that a PBR of 30 was "conservative" compared to a higher PBR that it might have proposed. AR Doc. 8933 at 14724; AR Doc. 8934 at 15790. Specifically, the Aquarium pointed out that the 2010 minimum population estimate for the stock (the basis of the proposed PBR of 30) used a survey correction factor

34

of two, while other researchers used a correction factor of 2.62 to estimate the population size of belugas in Cook Inlet, Alaska (which yields the higher PBR). Id. But the Aquarium never proposed the use of a higher PBR. "A party must first raise an issue with an agency before seeking judicial review." ExxonMobil Oil Corp. v. FERC, 487 F.3d 945, 962 (D.C. Cir. 2007) (citing United States v. L.A. Tucker Truck Lines, 344 U.S. 33, 36–37 (1952)). Arguing that the proposed PBR of 30 was conservative is not the same as proposing a higher PBR.

Moreover, NMFS does not have a "MMPA practice" of using some specific survey correction factor for beluga whales, as the Aquarium asserts. That is a scientific question for researchers in the field, not a matter of agency "practice." The 2010 minimum population estimate for the Sakhalin-Amur stock was the product of detailed statistical analysis by Dr. Shpak, and the survey methodology and PBR calculations were reviewed by the IUCN panel of scientists. AR Doc. 8915 at 13782-84, 13804-811. See also AR Doc. 8913 at 13721-22 (another scientific paper estimating beluga abundance in West Greenland using yet a different correction factor). The IUCN panel also had reservations about even the 2x factor used by Dr. Shpak and did not suggest that a higher one was appropriate without further scientific analysis. AR Doc. 8915 at 13789 ("The panel did not consider this method acceptable because it falls outside the spectrum of algorithms tested during development of the PBR approach"). The correction factor also in

part depends on the survey methods and conditions.[13] Any higher correction factor for the Sakhalin-Amur stock should be the subject of a scientific, peer-reviewed paper, which does not exist in the record here.

Finally, regardless of whether PBR is 30 or 46, the agency's reasons for not relying on the Aquarium's proposed PBR comparison remain valid. NMFS' analysis indicated that the Sakhalin-Amur stock likely had declined from the ongoing removals and other untracked human-caused mortality. In essence, NMFS found that whatever PBR is, it likely had been exceeded by total removals and other mortality. Decision at 17449-50. Relying on the Aquarium's proposed PBR or a higher PBR thus would not make a difference in this case.

## II.   The Aquarium Failed to Show That Replacement Takes Would Not Occur From the Sakhalin-Amur Stock of Beluga Whales

NMFS also found that the Aquarium had failed to show that the proposed imports would not result in additional takes from the Sakahalin-Amur stock, contrary to 50 C.F.R. § 216.34(a)(7)):

> There are ongoing, legal marine mammal capture operations in Russia that are expected to continue, and we believe that issuance of this permit would contribute to the demand to capture belugas from

---

[13] In one paper, researchers noted that a correction factor for a particular aggregation "in shallow, clear water" was not available and thus no correction could be made. AR Doc. 8933 at 15703. For the 1989 and 2010 population estimates for the stock, NMFS noted that "different survey methodologies" had been used and notably did not try to use the higher correction factor of the 1989 estimate to recalculate the 2010 estimate (or vice-versa). Decision at 17451.

> this stock for the purpose of public display worldwide, resulting in
> the future taking of additional belugas from this stock.

Decision at 17440. NMFS' finding is reasonable and consistent with its

longstanding interpretation of 50 C.F.R. § 216.34(a)(7).

### A. NMFS' Interpretation of 50 C.F.R. § 216.34(a)(7) Is Not Plainly Erroneous or Inconsistent With the Regulation

"An agency's interpretation of its own regulations is 'controlling unless

plainly erroneous or inconsistent with the regulation.'" Sierra Club v. Johnson, 436

F.3d 1269, 1274 (11th Cir. 2006) (quoting Auer v. Robbins, 519 U.S. 452, 461,

(1997)). Under 50 C.F.R. § 216.34(a)(7), NMFS has long required import permit

applicants to show that no replacement takes will occur. Decision at 17424 ("the

point of this criterion is that the foreign shipping facility will not replace these

animals with additional animals of the same species.").

NMFS' interpretation is not plainly erroneous or inconsistent with the

regulation. The regulation requires a showing that any requested import "will not

likely result in the taking of marine mammals  . . . beyond those authorized by the

permit." 50 C.F.R. § 216.34(a)(7). Replacement takes from a stock are "beyond

those authorized by the permit." Moreover, NMFS' interpretation is consistent

with the purposes of the MMPA to protect marine mammals in the wild. When

imports likely will result in replacement takes from a stock, there is a potential for

additional harm to the stock and the marine ecosystem.

The Aquarium does not even claim that NMFS' interpretation is plainly erroneous or inconsistent with the regulation, or acknowledge that test. Instead, the Aquarium first argues that "[t]he analysis under 50 C.F.R. §216.34(a)(7) is whether the import will 'likely' result in <u>additional MMPA permits</u> to take animals from the wild." Pl. Br. 33 (emphasis added). That is not the standard, and the Aquarium cites no authority for that proposition. NMFS expressly rejected this standard. Decision at 17424. The Aquarium's purported standard also has no support in the regulation, which refers to additional "taking" not "permits."

After first misstating the standard, the Aquarium argues that NMFS' interpretation of its regulation is improperly based on a proposed regulation. Pl. Br. 36. The 1993 proposed rule stated that the applicant must show that the permit

> is not likely to result in a take of protected species or protected species parts other than that authorized by the permit (e.g., the import or export is not likely to result in replacement takes or otherwise increase demand for protected species or protected species parts resulting in takes to meet such anticipated demand).

58 Fed. Reg. 53,320, 53,342 (Oct. 14, 1993). The final regulation at 50 C.F.R. §216.34(a)(7) is largely the same, but the "e.g." text was removed. 61 Fed. Reg. 21,926, 21,936 (May 10, 1996). But that text merely provided examples of future take that would prevent permit issuance. The remaining language by definition encompassed the stated examples because examples are just concrete instances of the more general statement. The omission of the explanatory "for example" text

38

thus has no effect on the substance of the final regulation.[14]

NMFS also found that the explanatory text, while removed from the final rule, nevertheless "describes the intent of this criterion" and thus the agency has evaluated prior applications consistent with that intent:

> we have required confirmation from exporting parties (i.e., the foreign facility that is shipping marine mammals to the U.S.) that they have no intention of replacing the animals they are exporting with animals of the same species. For previous imports of beluga whales (from Mexico, Germany, and Canada), the shipping facilities in those countries have provided assurances that additional animals would not be acquired as a result of the import.

Decision at 17424. The Aquarium does not dispute that NMFS has previously interpreted the regulation in the manner applied to it. Indeed, the Aquarium adopted the agency's interpretation in its import application and in a prior application to import belugas from Mexico. Application at 14294 ("Statement on Replacement of the Animals"); Exhibit 1 at 22 (stating that "[t]he importation will

---

[14] The Aquarium suggests that 1994 MMPA amendments required removal of the explanatory text, which is not accurate. Pl. Br. 37. The Aquarium quotes out of context a statement that the final rule "implements only a part of that proposed rule." The unimplemented parts of the proposed rule are not relevant here and mainly concerned captive marine mammal maintenance. Compare 1993 Proposed Rule, 58 Fed. Reg. at 53,346-47 ("captive maintenance" provisions at Section 216.37) with 1996 Final Rule, 61 Fed. Reg. at 21,935-36 (omitting those provisions). This change was necessary because the 1994 MMPA amendments removed NMFS' jurisdiction over captive maintenance and transferred it to the U.S. Department of Agriculture. See MMPA Annual Report, January 1, 1994 to December 31, 1994, at 1 (noting the "elimination of NMFS jurisdiction over the care and maintenance of captive marine mammals held for public display"), available at http://www.nmfs.noaa.gov/pr/pdfs/laws/mmpa_annual_1994.pdf.

not result in the collection of beluga whales from the wild nor will replacement animals be collected by [the foreign shipper].")

Although previously acknowledging the agency's interpretation of 50 C.F.R. § 216.34(a)(7), the Aquarium now claims it is contrary to 1993 statements of agency personnel. Pl. Br. 38; ECF No. 55- 9. But even looking at the selected hearing excerpts provided by the Aquarium, they do not support its argument. NMFS personnel expressly stated that the criterion was designed to prevent imports that result in "replacement takes." ECF No. 55-9 at 11-12. Other parts of the hearing transcript omitted by the Aquarium make this even clearer. NMFS officials stated that "if the impact of that [import permit] is going to be that additional take, then we're going to have to consider that as part of the issuance criteria." Nov. 22, 1993 Transcript, attached as Exhibit 2 at 44-45. They also stated that "if there's some commercial operations in place where people are going out and catching marine mammals and then exporting them overseas and the result of that could be that the marine ecosystem suffers, that would be – that's just a general policy of the MMPA to protect the marine ecosystem." Id. at 45-46.

Lacking any basis for its arguments in past agency practice or statements, the Aquarium resorts to an audacious claim that NMFS is unlawfully applying the MMPA outside the United States. Pl. Br. 41-42. NMFS is applying the MMPA to the Aquarium, not a foreign citizen as the Aquarium claims. Id. Nor is NMFS

40

finding any foreign conduct unlawful or requiring foreign nationals to halt any activity, as the Aquarium argues. Id. NMFS is simply enforcing the MMPA's moratorium on U.S. imports of marine mammals. 16 U.S.C. § 1371. That import ban has an exception for public display, but only where the statutory and regulatory requirements are met and the permit is consistent with the purposes of the MMPA. 16 U.S.C. § 1374(d)(3); see also id. at § 1374(b)1.

And contrary to the Aquarium's argument, the MMPA is not directed solely at the protection of marine mammals in the United States and on the high seas. Pl. Br. 42. "The MMPA addresses not only the killing of marine mammals by Americans but also the importation of them." Animal Welfare Inst. v. Kreps, 561 F.2d 1002, 1010 (D.C. Cir. 1977). "This reflects a congressional decision that denial of import privileges is an effective method of protecting marine mammals in other parts of the world." Id.

The Aquarium also goes overboard in asserting that NMFS' decision "effectively precludes" U.S facilities from importing belugas and "illegally repeals statutory language allowing for the continued collection and import into the U.S. of marine mammals for public display." Pl. Br. 42. NMFS denied one application to import 18 belugas collected from one Russian stock of belugas. There are beluga stocks in other countries, including off the Alaskan coast. AR Doc. 8917 at 13828; AR Doc. 8923 at 13913. While the Aquarium claimed that other sources were not

currently viable, it has not established that no future sources will become available. And even if that were the case, the MMPA prohibits the importation of marine mammals where the statutory and regulatory requirements are not met. 16 U.S.C. § 1371; 16 U.S.C. § 1374(d)(3). There is no absolute right to import a particular species of marine mammal for public display under the MMPA.

### B.    The Aquarium Failed To Provide Assurance That Replacement Takes Would Not Occur

The Aquarium also attacks a straw-man: a purported finding by NMFS that "importing whales into the U.S. will create a foreign market for beluga whales" or "contribute to a worldwide demand to capture belugas for public display." Pl. Br. 34-35. NMFS did not find that the permit would "create" a "foreign market" or "worldwide demand" for belugas, as the Aquarium claims. The agency found only that it was likely that the permit would result in the taking of additional belugas from the Sakhalin-Amur stock. Decision at 17424; id. at 17440 ("issuance of this permit would contribute to the demand to capture belugas from this stock") (emphasis added). There is nothing remarkable about that finding given the longstanding, ongoing live captures from the Sakhalin-Amur stock.

The Aquarium also asserts that NMFS applied an "incorrect evidentiary standard" when it stated that "it is possible an additional 18 whales would be captured and removed from the same wild population." Pl. Br. at 39-40 (emphasis

in original). But NMFS found more than a "possibility" of additional removals; it found they were <u>likely</u> to occur. Decision at 17424 ("In fact, additional beluga whales are <u>likely</u> to be captured as part of the ongoing, legal marine mammal capture operation in Russia.") (emphasis added); <u>id.</u> at 17440 ("We have determined that the requested import will <u>likely</u> result in the taking of marine mammals beyond those authorized by the permit.") (emphasis added).

Disputing NMFS' finding, the Aquarium asserts that NMFS offers "no proof of any cause and effect relationship" between the proposed imports and replacement takes. Pl. Br. 38-39. But between 1990 and 2010, Russian operations have caught and sold at least 237 beluga whales. Decision at 17444. There is every reason to conclude that this practice will continue and that as belugas are sold and/or exported, more will be caught to replace them. Notably, the annual Russian quota reportedly was between 40-57 belugas, which would allow removals at even higher levels than for the 2000-11 period (about 22 whales per year). Decision at 17445. NMFS reasonably found that replacement takes were likely on this record.

Moreover, the Aquarium bore the burden of proof under the evidentiary standard set forth in the MMPA. In its application, the Aquarium recited that no replacement takes would occur, but in truth only claimed that granting the permit would not lead to increased demand by U.S. public display facilities for belugas and that any additional takes would not increase the Russian capture quotas.

43

Application at 14294. The Aquarium provided no assurance or proof that the Russian capture operation would not take additional belugas from the stock to replace any shipped to the United States, as NMFS found was likely.

Repeating the more limited claim in its application, the Aquarium continues to argue on appeal that "the import will likely eliminate the need for future collections because the import allows for a captive, self-sustaining U.S. population." Pl. Br. 43. The Aquarium similarly asserts that "Defendants admit "it is extremely unlikely, but not impossible, for other [U.S.] marine mammal facilities to request a similar permit in the future." Pl. Br. 33 (citing AR Doc. 9096). First, the cited document is a "Draft Environmental Assessment" and thus is an admission of nothing. But even if the Aquarium's claims were true, it would only mean that U.S. facilities will not seek to import more belugas from the stock. It does not mean the foreign shipper will not obtain more belugas from the stock to replace those shipped to the U.S. in order to supply facilities in other countries. Even in this appeal, the Aquarium is not pointing to any evidence or proof that replacement takes from the stock will not likely occur as a result of the proposed importation and instead mainly claims no such showing should be required.

NMFS' determination is reasonable and based on its longstanding interpretation of 50 C.F.R. § 216.34(a)(7). That interpretation is not plainly erroneous or inconsistent with the regulation and therefore is controlling. Sierra

44

Club, 436 F.3d at 1274; Auer, 519 U.S. at 461.

### III.   The Aquarium Failed to Show That Five Belugas Were Independent of Their Mothers at the Time of Capture

NMFS also found that the Aquarium had failed to show that five of the 18 belugas were independent of their mothers and thus not nursing at the time of capture. Decision at 17425-26. Section 102 of the MMPA and NMFS' regulations both expressly state that marine mammals proposed for importation must not have been nursing, or less than eight months old, whichever occurs later, at the time of the original take (i.e., capture). 16 U.S.C. § 1372(b). See also 50 C.F.R. § 216.12.

In applying this requirement, NMFS first had to determine what "nursing" meant for beluga whales. NMFS considered "whether or not nursing in this context means a calf is fully dependent on its mother for survival," or rather "if it is a broader concept in that while the calf is in the process of becoming independent, it is still occasionally nursing from its mother." Decision at 17425. NMFS noted that it was "difficult to visually determine when an animal is fully independent" from its mother and reasoned it was consistent with the intent of the MMPA to restrict importation only "to those individuals that were taken after such time that they were considered to be independent of their mothers." Id. at 17425-26.

NMFS looked to the scientific literature to determine when belugas are considered to be independent of their mothers. NMFS found that the "literature

supports a conclusion that beluga calves are nursed for two years and may continue to associate with their mothers for a considerable time thereafter." Decision at 17426 (citing Reeves et al. 2002 (AR Doc. 8923)). Indeed, Reeves 2002 states that, "[y]oung Belugas are nursed for two years and may continue to associate with their mothers for a considerable time thereafter. The calving interval probably averages three years." AR Doc. 8923 at 13915. Here, five of the belugas were estimated to be only 1.5 years old at the time of capture. Application at 14286.

While at that age beluga calves may supplement their diet with other food, they continue to be dependent on their mothers for milk. As NMFS explained, belugas "appear to be dependent on their mothers for nursing for the first year, when their teeth appear (Katona et al. 1993), at which point they supplement their diets with shrimp and small fishes (Haley 1986)." Decision at 17426 (citing AR Doc. 8917). Indeed, Katona et al 1993 states that, "[c]alves are completely dependent on nursing for a year, supplement mother's milk during the second year with food caught by hunting, and are weaned at age 2." AR Doc. 8917 at 13830. Based on this literature, NMFS concluded that "[a]t 1.5 years of age, beluga whale calves are likely not independent from their mothers." Id. Thus, the Aquarium's claim that NMFS cites "no evidence" in support of its determination is not true. Pl. Br. 44-45. NMFS cited supporting scientific literature for its determination.

Ignoring the literature cited by NMFS while citing none of its own, the

46

Aquarium contends that "[a]bsent a mother-calf pair and a lactating female, there can be no nursing juvenile." Pl. Br. 44. As an initial matter, the Aquarium did not make this argument in its application and thus cannot raise it now. Am. Forest Res. Council v. Ashe, 946 F. Supp. 2d 1, 12-13 (D.D.C. 2013). Rather, the Aquarium argued that "[b]eluga whales . . . have juveniles that are independent by 1.5 years of age." AR Doc. 8933 at 14717. NMFS addressed this argument, finding that "[w]hile some beluga whales may be independent at this age, it doesn't logically follow that every individual will be and we cannot assume that all 1.5 year olds are independent from their mothers." Decision at 17426.[15]

In any event, the Aquarium's new argument makes no sense because beluga calves easily could have become separated from their mothers by the capture operation and thus there would be no "mother-calf" pair in the collected animals. Indeed, the Aquarium cites information that the capture operation did not engage groups with mother-calf pairs. Pl. Br. 44 (citing AR Doc. 8999 at 17466). But that procedure would still allow the capture of calves that were physically apart from or not observed with their mothers at the time of capture. The Aquarium's related claim that "no nursing was occurring" because "all the belugas took food almost

---

[15] In addition, NMFS found that some of the animals potentially were younger than 1.5 years old. In general, the agency had "questions about the accuracy of the estimated age at collection." Decision at 17426-27.

immediately after collection" is similarly without basis. Pl. Br. 45-46. As the literature states, belugas between the ages of one and two will supplement their mother's milk with fish and shrimp. AR Doc. 8917 at 13830. Such calves naturally would eat fish if given to them after capture absent their mothers.

Given the foregoing, there is no relevance to the Aquarium's observation that NMFS previously adopted a policy that nursing must be "obligatory for sustenance and not for psychological purposes." Pl. Br. 44-45. NMFS did not find that the five belugas captured at 1.5 years of age were nursing for "psychological purposes." It found based on the scientific literature that they likely were not independent of their mothers for food, i.e., sustenance, at the time of capture and thus could not be imported under the MMPA and regulations.

## IV. The Aquarium's Requested Remedy Is Not Available

The Aquarium asks this Court to order NMFS to issue the permit. Pl. Br. 48-49. This remedy is not available. "[E]xcept in rare circumstances," the proper remedy in APA cases is to remand the decision to the agency for reconsideration. Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985); Sierra Club v. Leavitt, 368 F.3d 1300, 1307 (11th Cir. 2004). Such rare circumstances exist when the agency would not be required to "bring its expertise to bear . . . evaluate the evidence . . . make an initial determination [and thereby] help a court later determine whether its decision exceeds the leeway that the law provides." Calle v.

U.S. Att'y Gen., 504 F.3d 1324, 1330 (11th Cir. 2007). Here, there are factual and scientific questions that NMFS would need to review on any remand.

Citing non-binding cases, the Aquarium argues that where the record does not support the agency's decision, an order requiring an agency to issue a permit is appropriate. Pl. Br. 49. None of the cited cases support this argument. In McDonnell Douglas Corp. v. NASA, 895 F. Supp. 316, 319 (D.D.C. 1995), the court found that there was "no need for agency expertise or experience" to resolve a legal issue under the Freedom of Information Act. In McElmurray v. U.S. Dep't Agric., 535 F. Supp. 2d 1318, 1336 (S.D. Ga. 2008), the court found "[r]emand is inappropriate because the record was unevaluated or ignored by agency officials." There is no claim that NMFS ignored the record. In Sierra Club v. EPA., 346 F.3d 955, 963 (9th Cir. 2003), the court found there "simply is no possibility" the facts supported the agency's decision. The Aquarium has not shown that is the case here.[16] And as the Eleventh Circuit has expressly held, "[i]f the record before the

---

[16] For example, if the Court required NMFS to rely on PBR in this case, it would have to re-examine the PBR calculation. PBR is calculated by multiplying: (1) the minimum population estimate of the stock; (2) one-half the net productivity rate of the species; and (3) a recovery factor between 0.1 and 1.0. Application at 14335-36. As noted above, MMC advised that the maximum net productivity rate proposed by the Aquarium was not appropriate for a declining stock. AR Doc. 8730 at 10095. MMC also suggested a lower recovery factor than the 0.5 proposed by the Aquarium. AR Doc. 8930 at 10095; Application at 14335. NMFS staff also found that if PBR was used, a lower recovery factor was necessary given the stock's status. AR Doc. 9001 at 17503. Use of a recovery factor lower than about

agency does not support the agency action  . . . the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." <u>Sierra Club</u>, 368 F.3d at 1304 (quoting <u>Fla. Power</u>, 470 U.S. at 744).

## Conclusion

NMFS reasonably found that the Aquarium had failed to meet its burden of showing that the permit met the statutory and regulatory criteria and was consistent with the main purpose of the MMPA to protect marine mammals in the wild. There is no "clear error of judgment" by the expert agency that would warrant reversal of its considered decision. <u>Fund for Animals</u>, 85 F.3d at 541.

Dated:          March 16, 2015                              Respectfully Submitted,

                                                            JOHN C. CRUDEN
                                                            Assistant Attorney General
                                                            SETH M. BARSKY, Chief
                                                            KRISTEN L. GUSTAFSON,
                                                            Assistant Chief


                                                            <u>/s/ *Clifford E. Stevens, Jr.*</u>
                                                            CLIFFORD E. STEVENS, JR.
                                                            Trial Attorney
                                                            U.S. Department of Justice
                                                            Environment & Natural Resources
                                                            Division
                                                            Wildlife & Marine Resources Section
                                                            Ben Franklin Station

---

0.35 would mean that annual live-captures alone (21.3) – not counting other mortality – would exceed the calculated PBR (21.3/(2,972 x 0.02)).

P.O. Box 7611
Washington, DC 20044-7611
Phone: (202) 353-7548
Fax: (202) 305-0275
Email: clifford.stevens@usdoj.gov

/s/ *Lisa D. Cooper*
LISA D. COOPER
U.S. Attorney's Office-Atlanta
600 U.S. Courthouse
75 Spring Street, S.W.
Atlanta, GA 30303
Phone: (404) 581-6249
Email: lisa.cooper@usdoj.gov

Attorneys for Federal Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such to the attorneys of record.

*/s/ Clifford E. Stevens, Jr.*
Clifford E. Stevens, Jr.